IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-50778
_____

UNITED STATES OF AMERICA

                              Plaintiff-Appellee,

          v.

LUIS ARMANDO RAMIREZ

                              Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas
(SA-95-CR-41)
_____
January 14, 1997
Before KING, JOLLY, and DENNIS, Circuit Judges.

PER CURIAM:[*]

     Luis Ramirez appeals his conviction for conspiracy with

intent to distribute in excess of 500 grams of cocaine and

possession with intent to distribute approximately two kilograms

of cocaine.  Although the district court erred in refusing to

allow testimony from Ramirez going to the motive or bias of two

of the principal witnesses against him, we find that the error

_____

     [*]Pursuant to Local Rule 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in Local Rule 47.5.4.

1

was harmless.  Therefore, we affirm.

# I. BACKGROUND

## A. Procedural History

Luis Ramirez was indicted by a grand jury on February 15, 1995.  The indictment charged him, together with Juan Ayala, Kenex Morales, and Gerardo Romero, with two counts: 1) conspiring to distribute and possess with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1); and 2) possessing with intent to distribute approximately two kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  Ayala, Morales, and Romero pleaded guilty, but Ramirez proceeded to trial.  Ramirez moved to suppress evidence and statements obtained from the stop and search of his pickup truck.  The district court denied the motion after an evidentiary hearing.  After a jury trial, Ramirez was found guilty of both counts of the indictment and was sentenced to 135 months imprisonment, supervised release for five years, fines totaling $500, and mandatory assessments totaling $100.  Ramirez filed a timely notice of appeal.

## B. Statement of Facts

### 1. Testimony at the Pre-Trial Suppression Hearing

Drug Enforcement Agency ("DEA") Special Agent Scott Holcomb

2

testified at the pre-trial suppression hearing that he received information from a confidential informant that a person the informant knew as "Juan" was trafficking in cocaine; that "Juan" was going to secrete kilos of cocaine in a "prepared" vehicle and deliver it to San Antonio; and that "Juan" would be traveling with someone. The informant had seen "Juan" traffick in cocaine on previous occasions, but did not know his last name or where he lived. Based on this information, telephone information, and utility checks, Houston DEA agents discovered the full name and address of Juan Ayala.

On January 18, 1995, agents set up surveillance at Ayala's apartment. They observed Ayala, Ramirez, and Romero at the apartment and then followed Ayala and Ramirez as the two drove off in Ramirez's truck. Holcomb testified that the Houston DEA agents observed Ramirez using evasive driving techniques "utilized to detect and try to lose any type of surveillance that might be on them." Ramirez drove to his house, but soon left again, leaving Ayala at the house. Agents did not see either man again until approximately 4:00 a.m. on January 19, when they drove by Ramirez's house and saw his truck.

Around 10:45 a.m. on January 19, agents observed Ramirez's truck at Ayala's apartment, but the truck left before the agents could set up proper surveillance or follow it. Around noon, the informant notified the agents that Ayala was on his way to San Antonio with the cocaine. Based on this information, agents in

3

San Antonio set up surveillance on the I-10 direct route from Houston to San Antonio.

In the meantime, the Houston agents conducted a search of the trash that Ayala had placed outside his door before he left. The agents found what they believed to be evidence of cocaine: two cocaine brick wrappings which contained what they believed to be cocaine residue; four baking powder boxes containing some baking powder, which is commonly used as a cutting agent in cocaine; and instructions to a digital O Haus scale, commonly used to measure out quantities of cocaine.

Sometime between 3:30 and 4:00 p.m., the San Antonio agents spotted Ramirez's truck coming into San Antonio. Around 5:00 p.m., the agents stopped the truck with the assistance of a San Antonio marked police unit. The uniformed officers, along with Special Agent Holcomb, his partner Arabit, and approximately eight other officers and agents, approached the truck cautiously, with their hands on their guns. Holcomb testified that they did not threaten, harass, or use any physical force against either Ramirez or Ayala. Agent Arabit asked the police officers to handcuff both Ramirez and Ayala and take them into custody. Arabit read the men their Miranda warnings and explained to them that they had been stopped because there was reason to believe that they were carrying cocaine. Ramirez acted very nervous, and before the agents had a chance to ask for his permission to search the truck he said, "There's nothing in the truck. Go

4

ahead search." The agents then specifically asked for Ramirez's permission to search the truck. Ramirez again said, "Go ahead and search the truck. I don't know what you're talking about, there's nothing in the truck." Ayala also gave his consent to search the truck. After conducting a search of the truck, the agents found two kilograms of cocaine inside a specially made long rectangular speaker box behind the driver's seat.

*2. Testimony at Trial*

Codefendants Romero, Morales, and Ayala testified for the government at Ramirez's trial, and Ramirez testified in his own defense. We set out the relevant testimony of each of the four codefendants in turn.

*(i) Romero's Testimony*

Romero testified on direct that he had known Ramirez since September of 1994. On the afternoon of January 18, 1995, Romero went to Ayala's apartment to pay him $500 for two ounces of cocaine that he had received from Ayala and Ramirez the day before. While he was at the apartment, he learned that Ayala and Ramirez were going to make a shipment of about five kilograms of cocaine to someone in San Antonio. Romero testified that Ramirez arrived at the apartment, the men talked briefly, and Ayala and Ramirez agreed to call him later, when everything was taken care of. Ayala called Romero when Ayala was driving to San Antonio to

5

request that he find two additional kilograms of cocaine and bring them to San Antonio. Ayala called Romero two more times once he reached San Antonio. Romero was arrested because he was bringing Ayala and Ramirez two of the four kilograms that were involved in the transaction.

Romero testified that Ramirez and Ayala had supplied him with cocaine on three or four prior occasions. On cross-examination he stated that Ramirez had been present at only one of the prior drug transactions; however, on re-direct, he stated that Ramirez would come over before drug transactions to discuss how much was needed, how long it would take to obtain that amount, and the price. In essence, Romero testified that Ramirez negotiated the prior drug transactions and Ayala delivered the drugs.

On cross-examination, Romero admitted that he thought Ayala and Ramirez had set him up and snitched on him and that he was unhappy with them. He denied, however, that he had ever made a statement that he would pay them back. He also denied that vengeance was one of his primary motives for testifying.

### (ii) Morales' Testimony

Morales testified that he met Ramirez four or five years ago and that they were friends. He testified that he had been involved in four or five drug transactions with Ramirez, Ayala, and Romero since September 1994. On cross-examination he

specified only three occasions and said that Ramirez was present on only one of them. His testimony differed from Romero's as to the details of the transactions. Morales testified that in the transaction involving Ramirez, Ramirez was the one with whom he negotiated a price and quantity. Morales obtained the two kilograms of cocaine that he and Romero brought to San Antonio from a friend of his. On cross-examination, Morales admitted that at the time he was arrested he thought Ramirez had snitched on him and he was unhappy with Ramirez.

### (iii) Ayala's Testimony

Ayala began his involvement with Romero and Morales in September 1994. Contrary to their testimony that he was selling cocaine to them, Ayala testified that they were distributing cocaine to him. Ayala testified that he never delivered cocaine to Morales or Romero. He testified that he did not think Ramirez ever talked to prospective buyers about the price or quantity of drugs, although Ramirez did direct prospective buyers to Ayala.

Ayala testified that Ramirez was one of his best friends. Ramirez introduced Ayala to people who wanted to buy cocaine, and he was also involved with Ayala in distributing cocaine.

On January 18, 1995, Romero came to Ayala's apartment, and they discussed Ayala's plan to take five kilograms of cocaine to San Antonio. Ayala needed a ride because he did not have a

7

driver's license. Ayala had made arrangements to meet with Ramirez that day to ask him for a ride to San Antonio. Once Ramirez arrived, the three men agreed to meet later to determine who was going to go with Ayala to San Antonio. Ayala left with Ramirez to go pick up a car from the shop and then the two men returned to Ayala's apartment. The car was not working very well, so Ayala asked Ramirez if they could take his truck to San Antonio. It was not unusual for Ayala to ask Ramirez to give him a ride to deliver cocaine somewhere or to borrow Ramirez's truck.

Ramirez came to Ayala's apartment in the morning on January 19. Ayala told him that he was going to go pick up some cocaine. Ramirez and Ayala left in separate cars. Ramirez was going to follow Ayala to pick up the cocaine, but they got separated and met back at the apartment after Ayala obtained the cocaine. At that point, Ramirez agreed to give Ayala a ride to deliver the cocaine. Ayala testified that Ramirez saw the cocaine and knew why they were making the trip to San Antonio. They discussed where to put the cocaine, and Ayala decided to put it in the speaker box. Ramirez was standing right next to the truck when Ayala put the cocaine in the speaker box. Ayala believed Ramirez was able to see what he was doing. On redirect Ayala testified that even if Ramirez had not seen him putting the cocaine in the truck, Ramirez knew he was delivering cocaine because they had talked about it the day before.

They left for San Antonio around noon. They were going to

8

party in San Antonio, and Ramirez was going to see his aunt. Ayala's wife accompanied them to San Antonio because she and Ayala had a fight the night before and she had requested that Ayala take her to her mother's house in San Antonio.

Ayala called Romero on his cellular phone while they were driving and asked him to bring more cocaine to San Antonio to complete the five kilograms. Upon reaching San Antonio, they dropped off Ayala's wife and daughter at Ayala's wife's mother's house. From there Ayala and Ramirez intended to go deliver the cocaine. The arrest ensued en route. After they were arrested, at the request of the law enforcement officers involved, Ayala telephoned Romero to arrange for the delivery of the additional cocaine.

On cross-examination, Ayala testified that Ramirez had no ownership interest in the cocaine and was not going to receive any of the profit from its delivery. On redirect, however, Ayala testified that Ramirez did get some profit or personal gain from the sale of cocaine because Ayala would sometimes give him a piece of what he got or pay his bills. Ayala and Ramirez did not need to have a formal agreement because it was understood that Ramirez would receive some benefit from helping Ayala distribute cocaine.

Also on cross-examination, Ayala testified that he had two prior convictions for possession of cocaine, for which he had gone to jail and been deported. He re-entered the country

9

illegally in January 1994. He expected the government to recommend a downward departure based on his testimony in court.

*(iv) Ramirez's Testimony*

Ramirez testified that he first became aware that Ayala was dealing drugs when Ayala was arrested for possession of cocaine in 1992. Ramirez said that he had no direct knowledge that Ayala was dealing drugs after his return to Houston in 1994, but he assumed that he was. He also testified, however, that he gave Ayala's beeper number to his friends at work who wanted to buy drugs. He was never involved in fixing the price or quantity of the drugs, and he never personally delivered cocaine. He had no idea that Ayala was dealing in such large quantities of cocaine.

Ramirez testified that he was working on the morning of January 18, 1995, when Ayala called him and asked him to take him to look at houses. When they were looking at houses that afternoon, Ayala told Ramirez that he was probably going to go to San Antonio the next day to take his wife to live at her mother's house. Ayala asked Ramirez to take him to San Antonio, and Ramirez said if he gave Ayala a ride he would go and see his aunt.

When Ramirez was at Ayala's apartment the next morning, he saw Ayala fiddling with the speakers in the truck, but he just assumed that the speakers had become disconnected. Ramirez testified that he did not know Ayala was taking cocaine to San

10

Antonio, and he would not have driven to San Antonio if he had known. Ramirez recalled that Ayala had made a phone call during the drive but said he had been talking to Ayala's wife at the time and had not been paying attention.

> *(v) Ramirez's Proffer*

The judge did not allow Ramirez to testify regarding threats he had received from Romero and Morales when he was in a holding cell with them. Ramirez made a proffer of the testimony he wished to give outside the presence of the jury. Ramirez stated that, after the detention hearing, he, Romero, and Morales were all placed in the same holding cell. When it became apparent that Ramirez was to be released on bail that day but Romero and Morales were not, they tried to pick a fight with Ramirez, asserting that he must have snitched on them. According to Ramirez, they told him, "We're going to testify against you. And, if we don't get you that way, we're going to get you outside the court." When questioned by his attorney as to whether Romero and Morales made threats against him to testify falsely, Ramirez answered in the affirmative. Ramirez also wanted to introduce evidence that Ayala's wife told him that her uncle, who was in the same prison cell as Romero and Morales, said they told him they would get her, Ayala, their children, her mother, and Ramirez.

## II. DISCUSSION

11

*A. Sixth Amendment Right to Confrontation*

Ramirez argues that the district court abused its discretion when it denied his attorney the opportunity to cross-examine Romero and Ayala about threats made by Romero and Morales to "get" Ramirez and Ayala and to testify falsely at Ramirez's trial. Ramirez contends that such cross-examination would have shown Romero's and Morales' motive and bias to perjure their testimony in favor of the government. Ramirez argues that the district court's ruling violated his Sixth Amendment right to confrontation.

Cross-examination to expose a witness' possible biases, prejudices or motives for testifying is always relevant as discrediting the witness and affecting the weight of his testimony. Davis v. Alaska, 415 U.S. 308, 315 (1974); United States v. Mizell, 88 F.3d 288, 292 (5th Cir. 1996). A defendant states a violation of the Confrontation Clause by "showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." Mizell, 88 F.3d at 293.

We review limitations on the scope of cross-examination for clear abuse of discretion. United States v. Duncan, 919 F.2d 981, 988 (5th Cir. 1990), cert. denied, 500 U.S. 926 (1991). A defendant's Sixth Amendment rights do not "guarantee cross-examination that is effective in whatever way, and to whatever

12

extent, the defense might wish." <u>Delaware v. Fensterer</u>, 474 U.S. 15,20 (1985). "Trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986). A restriction on cross examination does not rise to the level of a Sixth Amendment violation if the jury is otherwise provided with sufficient information to evaluate the bias and motives of a witness. <u>Mizell</u>, 88 F.3d at 293.

On cross-examination of Romero, Ramirez's attorney established that Romero had not known that Ayala was calling him from jail and that if Romero had known Ayala was setting him up, he never would have come to San Antonio. Romero admitted that after he was arrested he thought Ayala and Ramirez had set him up and snitched on him to get him arrested. However, when Ramirez's attorney asked, "And, you also, made statements in the Bexar County Jail to Alejandro Isaac that you would do anything to make sure that they paid for what they done to you. Isn't that true?", the government objected on the grounds of improper impeachment. The court sustained the objection. In response to further questioning, Romero stated that he did not know Alejandro Isaac, he had never said that he would pay Ayala and Ramirez back, and vengeance was not one of his primary motives for

13

testifying. Ramirez's attorney then moved on to question Romero about different matters. Likewise, during cross-examination of Ayala, the government objected, citing hearsay and testimonial questions, when Ramirez's attorney asked Ayala whether he had received threats from Romero and Morales when they were in a holding cell together. The court sustained the objection, and Ramirez's attorney moved on to a different topic.

Our examination of the record shows that the cross-examination of Romero allowed by the district court in this case was sufficient to allow a jury to appraise the co-conspirators' biases and motives to testify against Ramirez. Furthermore, the district court correctly sustained the government's objections to the cross-examination of Ayala regarding threats he had received. As the government correctly noted, threats made to Ayala are not relevant to the motives of Romero and Morales to testify against Ramirez.

**B. Admissibility of Extrinsic Evidence of Bias**

The district court's refusal to let Ramirez's attorney question him as to the threats he received from Romero and Morales while they were in the holding cell together does not violate the constitutional right that Ramirez identified in his brief. Ramirez addresses this issue not as a limitation on his own right to testify but as a restriction of his right to put on

extrinsic evidence going to the motive and bias of his codefendants who are testifying against him.

A restriction on the testimony of Ramirez designed to show the motive and bias of his codefendants, even if erroneous, does not violate the Sixth Amendment right to confrontation. Instead, such a restriction is an evidentiary ruling, and it is reviewed under the abuse of discretion standard applied to all evidentiary rulings.

The district court sustained the government's objection to the proffered testimony on the ground that Rule 608(b) does not allow the use of extrinsic evidence to attack the credibility of a witness. As the government admitted in its brief to this court, the district court's ruling on the proffered testimony, based on Rule 608(b), was erroneous. Although Rule 608(b) generally prohibits extrinsic evidence on the issue of credibility, it does not prohibit extrinsic evidence relevant to a witness' bias or motive for testifying. United States v. Abel, 469 U.S. 45, 56 (1984).

Ramirez argues that the district court abused its discretion in not letting his attorney question him regarding the threats Romero and Morales made against him in the holding cell. We agree. If the evidence had been admitted, it would have had a tendency to show the biases and motives of Romero and Morales in testifying against Ramirez. However, the district court's erroneous evidentiary ruling does not justify reversal of the

15

case.

Because this court is reviewing an erroneous evidentiary ruling, and not the denial of a constitutional right, the court must apply the harmless error standard of Federal Rule of Criminal Procedure 52(a).[1]  United States v. Arroyo, 805 F.2d 589, 598 (5th Cir. 1986).  The Supreme Court set out the correct standard to use in evaluating error under Rule 52(a) in Kotteakos v. United States, 328 U.S. 750 (1946).  The test under Kotteakos is whether the error "had substantial and injurious effect or influence in determining the jury's verdict."  Id. at 776.

The district court's erroneous evidentiary ruling did not substantially influence the jury verdict for several reasons. Ramirez was convicted of participating in a conspiracy to sell drugs "beginning on or before January 18, 1995 . . . and continuing until January 20, 1995" and of possessing drugs on January 19.  Ayala testified that he had discussed the trip to San Antonio with Ramirez and that Ramirez knew they were making a drug delivery.  Ramirez's testimony as to the threats he received would not have changed the jury's evaluation of Ayala's testimony.

Second, Ramirez's testimony tending to show bias would have been largely cumulative of the cross-examination of Romero and

---

[1]"Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."  FED. R. CRIM. P. 52(a).

16

Morales in which they admit that they thought that Ramirez had snitched on them and that they were unhappy with him. The additional contribution by Ramirez -- that Romero and Morales had actually threatened to testify falsely against him -- would have added little to the admitted evidence of their motives and bias. The extent of cross-examination permitted was sufficient to alert the jury to any possible bias or motive that Romero or Morales might have in testifying against Ramirez. Furthermore, reason for bias or motive is plainly evident from the facts of the case -- that Ayala called Romero after Ayala and Ramirez had already been arrested and told him to bring the cocaine to San Antonio. In addition, jury instructions addressed the issue of bias and motive, and Ramirez's attorney argued it in his closing argument. The court instructed the jury to receive the testimony of alleged accomplices "with caution" and weigh it "with great care." The court also supplemented the pattern instruction regarding credibility with language about bias.

Finally, the prosecution's case is very strong overall. The information from the confidential informant, the surveillance by DEA agents, circumstantial evidence, and the testimony at trial by witnesses besides Romero and Morales all point strongly towards Ramirez's knowing involvement in the distribution of cocaine.

Thus, in light of the record as a whole, it cannot be said that the error had a substantial influence on the judgment. See

17

<u>Kotteakos</u>, 328 U.S. at 765.  Although the district court made an erroneous evidentiary ruling, the error is harmless and does not require reversal.

## C. *Requested Accomplice Instruction*

Ramirez argues that the district court erred in denying his requested instruction on accomplice testimony.  We give the district court wide latitude in formulating the jury instructions and review a district court's refusal to give a requested instruction under an abuse of discretion standard.  <u>United States v. Smithson</u>, 49 F.3d 138, 142 (5th Cir. 1995).  We reverse only if the proposed instruction (1) is a correct statement of the law, (2) was not substantially covered in the charge actually delivered to the jury, and (3) concerns an important point in the trial such that the failure to give it seriously impaired the defendants's ability to present an effective defense.  <u>United States v. Gaytan</u>, 74 F.3d 545, 553 (5th Cir. 1996).  Denial of a requested instruction is not error when its substance is implicit in the instructions given.  <u>United States v. Ramirez</u>, 963 F.2d 693, 705 (5th Cir.), <u>cert. denied</u>, 506 U.S. 944 (1992).

In this case, Ramirez requested Fifth Circuit Pattern Jury Charge No. 1.15.  The court ruled that it was "given as modified" and gave No. 1.16 instead.  These instructions are substantially similar.  No. 1.15, addressing the testimony of alleged

18

accomplices, paid informers, and those testifying in return for

immunity or personal advantage, states:

> The testimony of an alleged accomplice, and the testimony of
> one who provides evidence against a defendant as an informer
> of the government for pay, or for immunity from punishment,
> or for personal advantage or vindication must always be
> examined and weighed by the jury with greater care and
> caution than the testimony of ordinary witnesses.  You, the
> jury, must decide whether the witness' testimony has been
> affected by any of those circumstances, or by his interest
> in the outcome of the case, or by his prejudice against the
> defendant, or by the benefits he has received either
> financially, or as a result of being immunized from
> prosecution.  If you determine that the testimony of such a
> witness was affected by any one or more of those factors,
> you should keep in mind that such testimony is always to be
> received with caution and weighed with great care.
> You should never convict any defendant upon the unsupported
> testimony of such a witness unless you believe that
> testimony beyond a reasonable doubt.

The charge employed by the court addressed only alleged

accomplices and stated:

> In this case the government called as three of its
> witnesses, alleged accomplices, named as a codefendant in
> the indictment, with whom the government has entered into a
> plea agreement, in which the government recommends a lesser
> sentence, subject to acceptance or rejection by the Court,
> than the codefendants would otherwise be exposed to for the
> offense to which the codefendants pled guilty -- pleaded
> guilty.  Such plea bargaining, as it is called, has been
> approved as lawful and proper and is expressly provided for
> in the rules of this Court.  An alleged accomplice,
> including one who has entered into a plea agreement with the
> government, is not prohibited from testifying.  On the
> contrary, the testimony of such a witness may, alone, be of
> sufficient weight to sustain a verdict of guilty.
> You should keep in mind that such testimony is always to be
> received with caution and weighed with great care.  You
> should never convict a defendant upon the unsupported
> testimony of an alleged accomplice unless you believe that
> testimony beyond a reasonable doubt.  The fact that an
> accomplice has entered a plea of guilty to the offense
> charged is not evidence in and of itself of the guilt of any
> other person.

19

The district court also gave the pattern instruction regarding credibility of witnesses and supplemented it with language about bias. The instructions given by the district court correctly stated the law, and the proposed instruction was substantially covered in the charge actually given. Thus, the district court did not abuse its discretion in refusing the requested jury charge.

## D. Evidence of Prior Drug Deals

Ramirez argues that the district court abused its discretion by admitting testimony about his involvement in cocaine transactions prior to the one for which he was arrested. This court reviews a district court's evidentiary rulings for abuse of discretion. United States v. Davis, 19 F.3d 166, 171 (5th Cir. 1994).

Federal Rule of Evidence 404(b) excludes evidence of extrinsic offenses to prove that a defendant acted in conformity with his character. FED.R.EVID. 404(b). Such evidence may be admitted, however, to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Id. Furthermore, evidence of acts committed pursuant to a conspiracy offered to prove a defendant's participation in a conspiracy is not extrinsic evidence and is therefore admissible. United States v. Royal, 972 F.2d 643, 647 (5th Cir. 1992).

20

The district court found that evidence of cocaine transactions among Ramirez, Ayala, Romero, and Morales in the fall of 1994 was "intrinsic" evidence admissible to prove the existence of a conspiracy. The district court found in the alternative that the evidence of prior transactions was admissible under Rule 404(b) to prove Ramirez's knowledge of the conspiracy and his intent to join it. Because the district court found that the probative value of the evidence was not substantially outweighed by undue prejudice and gave appropriate limiting instructions regarding the evidence, the court's admission of the evidence was not an abuse of discretion.

## E. Denial of Motion to Suppress

Ramirez argues that the district court erred in denying his motion to suppress evidence. He challenges the vehicle stop, detention, and the consensual search of his truck on the grounds that the officers had neither reasonable suspicion nor probable cause to stop his truck, he was placed under arrest without probable cause, his consent to search was tainted by the unlawful stop and arrest, and his consent to search was not voluntary.

In reviewing a district court's ruling on a motion to suppress based on live testimony, this court reviews findings of fact for clear error but reviews the determination of reasonable suspicion or probable cause de novo. Ornelas v. United States,

21

116 S.Ct. 1657, 1663 (1996). We review the evidence in the light most favorable to the prevailing party in the district court and view not only the evidence taken at the suppression hearing, but also the evidence taken at trial. United States v. Cardenas, 9 F.3d 1139, 1147 (5th Cir. 1993), cert. denied, 114 S.Ct. 2150 (1994).

In denying the motion to suppress, the district court made specific findings: that the informant was reliable, that the officers had reasonable suspicion to stop Ramirez's truck, that Ramirez and Ayala were not placed under arrest at the time they were detained, that Ramirez's consent to search was voluntarily given, and that the preponderance of the evidence showed that Ramirez knew of his right to refuse consent.

DEA agent Holcomb testified at the suppression hearing about the information he received from the confidential informant. Holcomb had worked with this informant for four or five months and had received other reliable information from him. The informant's information was also corroborated independently by surveillance and the search of the trash outside Ayala's door, thus enhancing its credibility. Based on this information, an experienced drug agent could reasonably believe that Ramirez and Ayala were transporting cocaine.

The district court concluded that the agents had reasonable suspicion to stop Ramirez's truck. We think this conclusion was correct. We would even suggest that the agents had probable

cause to stop the truck.  We need not reach this conclusion, however, because we agree with the district court that Ramirez's consent to search the truck was voluntarily given.

A finding of fact is clearly erroneous when, although there is enough evidence to support it, the reviewing court is left with a firm and definite conviction that a mistake has been committed.  United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).  If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently.  Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985).  Our review of the record does not reveal clear error in this case.

To be valid, consent to search must be knowing and voluntary, based on the totality of circumstances.  Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).  The presence of numerous officers and the fact that Ramirez was handcuffed at the time he gave his consent to search the truck does not preclude his consent from being voluntarily given.  Ramirez volunteered his consent to search the truck almost immediately after he was stopped.

The government must prove that consent was given voluntarily only by a preponderance of the evidence.  United States v. Yeagin, 927 F.2d 798, 800 (5th Cir. 1991).  Six factors are

relevant to a determination of the voluntariness of consent: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police proceedings; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." Id. Based on the totality of circumstances in this case, the district court did not commit clear error in finding that Ramirez's consent was voluntarily given.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.